**BLAW–KNOX COMPANY, Plaintiff-Appellant,**

v.

**I. D. LAIN COMPANY (Inc.),**
Defendant-Appellee.

No. 11591.

United States Court of Appeals
Seventh Circuit.

Feb. 27, 1956.

————◆————

Walter J. Blenko, Pittsburgh, Pa., Paul W. Gordon, Springfield, Ill., William H. Parmelee, Pittsburgh, Pa., William Henry Venable, Pittsburgh, Pa., of counsel, for appellant.

Otis A. Earl, Kalamazoo, Mich., Arthur M. Fitzgerald, Springfield, Ill., Austin A. Webb, Kalamazoo, Mich., of counsel, for appellee.

Before DUFFY, Chief Judge, and LINDLEY and SWAIM, Circuit Judges.

LINDLEY, Circuit Judge.

Plaintiff appeals from a judgment declaring invalid all claims of its patent to Bushnell, its assignor, number 2,361,-377, applied for September 23, 1941, allowed October 31, 1944, on which it had brought suit against defendant for infringement. The Court found, further, that if the patent were valid, it would be infringed by the device used by defendant. There is no attack upon the latter finding, but plaintiff, on appeal, questions the judgment of invalidity.

The patent pertains to a mechanism for paving concrete highways and other roadways and to the methods employed

in operating it. Claim 2, typical and representative of all claims covering the apparatus, is as follows: "In a concrete paving machine comprising (1) a car movable along the area to be paved, (2) a strike-off blade on the car (a) extending transversely thereof and lying in a vertical plane (3) means for adjustably mounting the blade in fixed relation on the car, (a) said blade having a narrow bottom working edge, which, through its engagement with the paving material leaves a surface which is fissured and porous, (4) and an element on the car in spaced relation to the scraper and substantially parallel therewith and which is behind the scraper relative to the operating direction of the car (a) for vibrating the paving material and by such vibration close the fissures and the portions from the bottom toward the top, (b) said element also having a smooth surface to wipe over the paving material and seal the surface thereof."

Claim 8, typical and representative of the method claims, reads: "The method of paving which comprises (1) dragging a strike-off having a narrow edge over a surface on which paving material has been spread (a) to remove excess paving material (b) and to produce a fissured and porous surface on the paving material (2) and thereafter subjecting the fissured and porous area of the paving material to a vibrating and smoothing action (a) at a distance back of the strike-off (b) greater than the depth of the paving material but sufficiently close to the strike-off so that the crevices will be closed and sealed before there has been any substantial evaporation of water or setting of the concrete."

When the demand for labor-saving devices for extensive paving of concrete highways arose, various delvers in the art of road-building machinery were not slow to offer suggestions. Thus, many devices were publicized. The conventional contrivance generally adopted consisted of a power driven machine which progresses on the highway as the concrete is dumped in front of it. This machine usually included, first, near its front, a spreader, which leveled or spread out relatively evenly the raw concrete placed on the foundation of the highway in front of the power driven machine. Closely following the spreader was an element known variously as the scraper or cut-off, which further leveled and evened the concrete. Scrapers were of various forms, varying from so-called snub-nosed cut-offs to relatively thin pieces of metal, that of the patentee being described as comparatively narrow. The scraper, following the spreader, left a rather rough surface on the concrete. In practice the paving apparatus was followed by a finishing machine which put in final shape the slab of concrete constituting the highway. There is no controversy between the parties that the combinations mentioned were conventional and old.

However, as the art developed, road builders and engineers drawing specifications for roads soon learned that a thin watery concrete, though it flowed more easily and was, therefore, more readily adaptable to the levelling off process, would not result in as strong a roadway as would use of a heavier concrete, that is, one containing less water, which did not flow so freely. Consequently, the industry found it essential that the heavier concrete be employed in order to meet engineering specifications for highways designed to resist constant wear from the traffic to which they were subjected. Though they recognized this essential principle, builders encountered difficulty in meeting specifications calling for the heavier concrete, for the reason that the latter material does not flow as freely, as we have said, and does not pack so perfectly, as does the lighter, more watery mixture. Consequently, it was found that air cells in the concrete tended to honeycomb the mixture after it was placed in the road, contributing to the early disintegration of the roadway when in use.

To correct this was a vital necessity, the seriousness of which seems to have been universally recognized. Various delvers in the art offered their respective

ideas. Among them was the suggestion of a so-called vibrating element, sometimes termed a conditioning or tamping means, which, after the concrete had been spread, as a part of the paving machine, would pass through the concrete violent vibratory motions which tended to eliminate the evils of honeycombing, remove air cells and make closely cohesive the masses constituting the concrete. Some of the workers in the art, and there were many, placed this element between the spreader and the scraper; others placed it on the finishing machine, following the road building machine. But none of the methods suggested furnished a satisfactory solution of the problem. The various persons engaged in studying the art and endeavoring to perfect it struggled valiantly, and suggested various combinations by which they hoped to eradicate the evil honeycombing effect. But until Bushnell came along, none of these efforts proved successful. He found the art unsettled and uncertain, and the persons engaged in it anxious to overcome the difficulty encountered in laying the stronger concrete and keeping it free of open air cells.

In this juncture of affairs, as a result of his experiments, Bushnell filed his application, upon which a patent issued with the ten claims we have mentioned. He included the conventional machine with a spreader and a cut-off scraper. But, in addition, he did something nobody else had done up to that time. He specified that the vibrating member, which was known in the art, should be placed behind the cut-off scraper, at a distance from the scraper at least greater than the thickness of the concrete, and suggested that this member be run at revolutions of at least 3,600 per minute. Thereby, he asserted, it stirred and vibrated the porous and fissured concrete left behind by the narrow scraper which he also prescribed. He specified that the distance between the scraper and the vibrating member should not be great, but that the two should be in close proximity, with the limitation aforesaid. At the same time, he declared that the cut-off scraper should be narrow, for the reason, as he said, that one of such character leaves a rough and porous surface readily adaptable to treatment by the vibratory member. This combination of old elements, with its specific placement and relationships of elements, he found, in his experiments, as he related, forced down through the rough, fissured concrete vibrations which passed to the bottom of the mass and then laterally and finally upwardly to the top thereof, removing all honeycombing effect and leaving a solid mass of concrete.

This, then, is his alleged invention, which the District Court thought possessed only the qualities of aggregation, reasoning that no new result had been achieved. Thus, in one if its findings, the court said: "The patentee Bushnell has bodily incorporated the high frequency tamper of the McCrery patent 2,042,156, May 26, 1936, as an attachment to the spreader of the Harrington patent 2,373,828, introducing a narrow edged strike-off blade between the Harrington spreader and the vibratory tamper of McCrery and asserts such combination as new and patentable." This, the court concluded, was mere aggregation.

■ We have examined the prior art references considered by the patent office and those produced at the trial of this cause not considered by that office, all the documentary evidence and the parol testimony. The latter is not largely in controversy and the conflicts in it are of minor importance and not essential and hardly relevant to the court's ultimate conclusion that Bushnell did not achieve invention. After considering all of this evidence, correlating it about the crucial issue, we are of the opinion that the court erroneously found that what Bushnell did amounted to mere aggregation.

■ It is undisputed that the three mentioned elements essential to Bushnell's combination were known to the art. However, it is clear from the evi-

dence that the specific arrangement and placement in combination which he prescribed and embraced in his claims and which, the proof shows, has solved effectually the serious problem that confronted road builders in the use of heavy concrete, had never been suggested. All prior efforts to solve the problem had resulted in ineffectiveness. For the first time in the art, Bushnell demonstrated that his specific placement and prescribed relationship of the three elements in a road building machine furnished a complete answer to the problem. In other words, to our way of thinking, all this produced a new and a useful result which had not been accomplished by any of the workers in the art prior to that time. In placing the vibratory member in the exact position which he specified, behind a cut-off scraper of the specific narrow character which he prescribed, leaving a porous, fissured surface, with the resultant removal of the air cells and honeycomb faults previously existing, what he did, we are sure, clearly amounted not merely to an aggregation of old elements where each did the work it had done before, but to a combination wherein the cooperating relationship of the cut-off and the vibratory member were such that he achieved the new beneficial result of eradication of the defects previously encountered in using heavy concrete. This, it seems to us, brings the case within the teachings of Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, from which it is clear that it constitutes patentable inventions to select elements out of old combinations while discarding others and to put them together in a new way, if a new and surprising result is achieved, or the new conjunctive elements exceed in whole the sum of its parts. See also Lewyt Corp. v. Health-Mor, Inc., 7 Cir., 181 F.2d 855, certiorari denied 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605; Helms Products, Inc., v. Lake Shore Mfg. Co., 7 Cir., 227 F.2d 677.

To say that Bushnell conceived mere aggregation with no new results is equivalent to saying that his achievement would have been obvious as a whole to a person having ordinary skill in the art to which it pertained, as those terms are employed in the Statute, 35 U.S.C. § 103. But here the undisputed facts show beyond peradventure that the conception was not obvious, that other workers in the art failed to comprehend the ideas disclosed by Bushnell or to suggest his successful solution of the troublesome problem. He was the first to accomplish a new and useful result. Upon this record, we think it clear that he made a patentable invention within the meaning of the statute.

The District Court expressed the thought that the claims of Jackson, 1,787,449, applied literally to the method claims, but scrutiny of Jackson discloses, first of all, that he was not dealing with road construction and, further, that the art in which he was interested did not lead him or the public in the slightest degree in the direction of Bushnell's achievement. Rather he prescribed submerged vibration, which the record discloses did not satisfactorily solve the problem. The teachings of Jackson are not within the claims of the Bushnell patent and do not anticipate. Nor, in our opinion, does any cited prior art teach what the patentee taught in any of his claims.

Such cases as Ajax Hand Brake Co. v. Superior Hand Brake Co., 7 Cir., 132 F.2d 606, are not persuasive in favor of the finding of invalidity. There we found that each element achieved only precisely the same function it had performed before it became a part of the combination. We held that there must be such cooperation and conjunction of old elements as to produce a new result.

The judgment is reversed and the cause remanded to the District Court with directions to proceed in accord with the announcements herein.